# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL O'NEIL CLOYD, | 1:09-cv-00854-LJO-SMS (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JAMES D. HARTLEY, Warden | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation ("CDCR") following his 1994 conviction of second degree murder. Petitioner is serving a sentence of 15 years-to-life in prison, plus a three year sentence enhancement for use of a firearm.

In the instant petition for writ of habeas corpus, Petitioner does not challenge the validity of his conviction; rather, he challenges the Board of Parole Hearings' ("Board") 2007 decision finding him unsuitable for release on parole.

In 2007, Petitioner filed a state petition for writ of habeas corpus in the Alameda County Superior Court challenging the 2007 Board's decision. The superior court denied the petition, finding that "The record presented to this Court for review demonstrates that there was certainly

some evidence, including, but not limited to the committing offense, Petitioner's failure to maintain sufficient and genuine participation in self-help and counseling programs to help Petitioner gain insight into the source of and ways to control his emotions of anger and rage that led to the committing offense, and the Board's finding that Petitioner was at least a moderate [risk] of dangerousness if released, and would remain so, until he gained better understanding and insight into his ability to cope with frustrations and stress in a non-controlled situation." (Exhibit B, to Answer, at 1.)

Petitioner then raised the same claims to the California Court of Appeal and California Supreme Court. (Exhibits C & E.) Both petitions were summarily denied. (Exhibits D & F.)

Petitioner filed the instant federal petition for writ of habeas corpus on January 5, 2009. Respondent filed an answer to the petition on August 3, 2009, and Petitioner filed a timely traverse on October 5, 2009. (Court Docs. 16, 19.)

## STATEMENT OF FACTS[1]

On January 27, 1992, Petitioner drove to the home of his father, George Cloyd, during the predawn hours. Petitioner was armed with a loaded 12-gauge shotgun. During an argument with his father inside the residence, Petitioner produced the shotgun and brandished it at his father. Petitioner ended the argument by firing the shotgun at his father from a distance of approximately ten feet. The blast from the shotgun struck Petitioner's father on the left side of his face causing major trauma. It was estimated that this type of injury would result in death within a few minutes. After killing his father, Petitioner attempted to clean up the site of the murder and placed the body of his father in the basement of the residence inside a hidden room behind a bookshelf. Petitioner removed large portions of blood stained carpet after failing in his efforts to clean the carpet with a commercial shampooer, which he rented after the murder. Petitioner removed several of his father's personal affects including a computer, a wallet with credit cards, and personal files. Petitioner discarded the shotgun at the San Leandro Marina. Petitioner feigned ignorance of his father's whereabouts when questioned by individuals concerned about

---

[1] This information is derived from the Transcript of the Board's 2007 hearing, which quoted from the Probation Officer's Report. See Exhibit C, to Answer, Attachment C.

his disappearance.

After being arrested by Oakland Police, Petitioner admitted shooting his father once but only after confronted with the fact that his father's blood was found on his tennis shoes. Petitioner claimed the shotgun discharged accidentally during a verbal dispute.

Aasylei Hutcherson testified that during a jail visit with Petitioner in late 1992, he told her that if he had to do it all over again he would do it the same way. Trial testimony included evidence that Petitioner harbored ill will toward his father for several months preceding the murder. Petitioner left his father's business after an internal audit disclosed that he had embezzled several thousand dollars. A confrontation between Petitioner and his father in November of 1991 ended when Petitioner brandished a loaded shotgun at him. Petitioner apparently threatened to report his father to the Internal Revenue Service and Federal Bureau of Investigations due to his father's unlawful use of aliases to run his business ventures.

On January 12, 1992, Petitioner stole his father's vehicle and was arrested by Oakland Police. In addition, during January 1992, Petitioner left a message on his father's telephone answering machine stating, "You have 48 hours to live, 48 hours." Petitioner also indicated to several people that he was not interested in reconciling with his father.
(Answer, Exhibit C, Attachment C, at 12-16.)

DISCUSSION

I.      Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation

1  pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state
2  court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because
3  he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass
4  v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v.
5  Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a
6  habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the
7  petition is not challenging [her] underlying state court conviction.'").

8  The instant petition is reviewed under the provisions of the Antiterrorism and Effective
9  Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63,
10 70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the
11 adjudication of the claim "resulted in a decision that was contrary to, or involved an
12 unreasonable application of, clearly established Federal law, as determined by the Supreme Court
13 of the United States" or "resulted in a decision that was based on an unreasonable determination
14 of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C.
15 § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

16 As a threshold matter, this Court must "first decide what constitutes 'clearly established
17 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,
18 *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this
19 Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as
20 of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other
21 words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or
22 principles set forth by the Supreme Court at the time the state court renders its decision." Id.

23 Finally, this Court must consider whether the state court's decision was "contrary to, or
24 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at
25 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may
26 grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]
27 Court on a question of law or if the state court decides a case differently than [the] Court has on a
28 set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.   Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

II.     Review of Petition

A parole release determination is not subject to all the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive

advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the Board must be supported by "some evidence" having an indicia of reliability. Superintendent, Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th Cir.1987).

"In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128. In determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. Id. Rather, the Court must determine whether there is any evidence in the record that could support the conclusion of the disciplinary board. Id., *citing* Superintendent v. Hill, at 455-56. Although Hill involved the accumulation of good time credits, the same standard applies to parole, as both situations "directly affect the duration of the prison term." Id., *citing* Jancsek v. Oregon Bd. of Parole, 833 F.2d at 1390.

In making a determination whether an inmate is suitable for parole, the Board is guided by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 Cal. Code Regs. §§ 2402(a) and (b).

In this case, with regard to the procedural protections outlined in Greenholtz, Petitioner was provided all that is required. Petitioner was given advance notice of the hearing, he was offered representation by counsel at the hearing, he was granted an opportunity to submit materials for the Board's consideration and an opportunity to be heard during the hearing, and he was provided a written decision explaining the reasons why parole was denied. See Answer, Exhibit A, Attachment C.

At the 2007 hearing, the Board found Petitioner unsuitable for parole based on the circumstances and lack of insight into the commitment offense, escalating pattern of violence including a prior domestic battery, and insufficient participation in self-help programming. (Id. at 70-84.)

The Board may consider whether a prisoner has shown "signs of remorse," that is, whether he "performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense." 15 Cal. Code Regs. § 2402(d)(3). The California Supreme Court recently affirmed that the circumstances and lack of insight into the commitment offense may support the finding that the prisoner remains a threat to public safety. In re Shaputis, 44 Cal.4th 1241, 1260 (2008). Because it does not appear that the Board presented a nexus between the circumstances of the commitment offense, itself, and the assessment of current dangerousness, this Court considers the commitment offense in conjunction with the lack of insight into the offense.

At the time Petitioner killed his father, he was on probation for an assault committed against his girlfriend-with whom he shared a child. This incident occurred in January of 2001, when Petitioner went to his girlfriend's class at the College of Alameda and took her back to her residence. As they drove to the residence, he told her "You better find a policeman before [I] cut her throat" because of his belief that she had been unfaithful to him. (Answer, Exhibit C, Attachment C, at 49.) Petitioner repeatedly told Ms. Wheeler that he was going to kill her at the apartment. Once the two arrived at the residence, Petitioner grabbed Ms. Wheeler by the arm

and hair and pulled her inside the apartment. Once inside, Petitioner grabbed a knife from the kitchen and stabbed her in the arm. Petitioner then drove Ms. Wheeler to her mother's house and dropped her off. (Id. at 49-50.) Because of this assault Petitioner was prohibited from purchasing any weapons, yet he had a friend purchase a shotgun for him. (Id. at 22-23, 77.) At the 2007 hearing, Petitioner explained the incident stating, "I was going through a failed relationship with my son's mother. And I was unable to control my anger at the time." (Id. at 18.)    The commitment offense occurred on January 27, 2002. Petitioner and his father had a volatile relationship beginning when Petitioner's mother left his father alone with Petitioner and his brother. At that time, Petitioner was only three years old and his brother was nine years old. Petitioner felt rejected by his father which increased into anger and resentment. Petitioner's father owned a general contracting business and Petitioner worked for him beginning at the age of twelve. A couple months before the killing, Petitioner's father discovered that he had embezzled money from the company and Petitioner either quit or was fired from the company. A few weeks before the shooting, Petitioner stole his father's vehicle to get his attention. (Id. at 51.) As a result, Petitioner was convicted of misdemeanor joyriding.

   On the day of the commitment offense, Petitioner went to his father's home in the predawn hours to confront him. Petitioner became anger because he felt that his father was not listening to him and the argument escalated to the point of pushing and shoving. At some point in time, Petitioner went to his vehicle and retrieved his shotgun. When he returned to the residence, Petitioner and his father continued to argue and Petitioner fired the gun at his father but it did not work. Petitioner then backed up and shot again striking his father in the head killing him almost instantly. Petitioner attempted to clean up the killing and denied any involvement until confronted by police with evidence. In late 1992, during a jail visit, Petitioner told his girlfriend that if he had to do it all over again, he would do it the same way. (Id. at 15.) Although Petitioner maintains the killing was an accident or unintentional, the fact that he previously threatened his father with a gun, belies his claim. (Id. at 61.)

   As noted by the Board, the most recent psychological report, authored by Dr. Starrett, dated December 5, 2006, opined the following:

8

> The inmate has a hard time discussing the crime and all the causal factors. He does accept responsibility for the crime. He does express sadness. In rating this individual in the clinical factor, he would rate in the low end of the moderate range for future violence. This rating is based on the inmate's reluctance to talk about ... his crimes in detail. In addition, the inmate has not been continuously involved in self-help or his religion. To his credit, he has been discipline-free.
>
> The inmate would rate in the low end of the moderate range in terms of his risk management for the future. The inmates has complied with the disciplines. He has not been as active as he could be in self-help.
>
> In summary, this individual overall appears to rate in the low end of the moderate range in his propensity to commit violence [in] the future when compared to similar violent inmates. This rating will continue to decrease as the inmate becomes more involved in self-help. The inmate needs to talk about his crime in more detail and his relationship with his father, which he appears to be reluctant to discuss. It might be advisable for this individual to seek out some kind of counseling from religious staff and/or mental health.

(Answer, Exhibit E, Attachment A, at 8; Exhibit C, Attachment C, at 38-39.)

The Board pointed out that in a short period of time Petitioner had an escalating pattern of criminal behavior that involved violence toward other people. (Id. at 77; see also 15 Cal. Code Reg. § 2402(c)(2).) There is certainly some evidence to support the Board's finding that Petitioner has failed to participate in self-help programming in order to gain understanding into the magnitude of his commitment offense. During his entire incarceration, Petitioner has only completed a three-hour program and was placed on a waiting list for a violence program just eight months prior to the 2007 hearing. (Id. at 74.) As stated by the Board and Psychologist, Petitioner has simply not taken the necessary measures to explore, understand, and address the nature and magnitude of the commitment offense, and some evidence supports the Board's finding that Petitioner therefore remains an unreasonable risk to public safety if released. The Board recommended that Petitioner take a look back at his 34 years of life "and analyze these things so you can assure somebody that you understand the sources of stress to you and that you've developed coping mechanisms." (Id. at 75.)

The Board also considered the factors in favor of Petitioner's release on parole. 15 Cal. Code Regs. § 2402(d). The Board commended Petitioner for maintaining disciple free throughout his entire period of incarceration, receiving positive work reports, and completion of small engine report, dry cleaning, and textile vocations. (Id. at 73.) However, on balance, these

positive factors did not outweigh the factors of unsuitability.

In addition, it is also significant under existing Ninth Circuit authority, at the time of the 2007 hearing, Petitioner had not yet served the minimum term of his 18-years-to-life (fifteen-years-to-life plus three year firearm enhancement) sentence.[2]  Thus, the due process concern regarding continued reliance on the immutable circumstances of the commitment offense as a basis to deny parole is not yet implicated.  Moreover, as explained *supra*, the Board relied on other factors beyond the circumstances of the commitment offense in finding Petitioner unsuitable for parole.

In sum, the factors upon which the Board and the superior court relied are supported by the record and constitute "some evidence" that Petitioner was unsuitable for parole and that he posed an unreasonable risk to public safety.  Therefore, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and,

2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with

---

[2] In Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir. 2003), the Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Although a denial of parole initially can be justified by relying on the gravity of the offense, over time, "should [the prisoner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." Irons v. Carey, 505 F.3d 846, 853 (9th Cir. 2007), *citing* Biggs, 334 F.3d at 916.  Nevertheless, as in this case, in both Irons and Biggs, the Ninth Circuit upheld the denials of parole because in each of these cases the prisoner had not yet served the minimum term of his sentence.

In this case, Petitioner's life term began in 1994, and at the time of the 2007 hearing, he had only served approximately 13 years of his 18-years-to-life sentence on the second degree murder charge.

the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   October 19, 2009**              /s/ Sandra M. Snyder
                                    UNITED STATES MAGISTRATE JUDGE